The SOCIETY FOR ESTABLISHING USEFUL MANUFACTURES et al. v. The MORRIS CANAL AND BANKING COMPANY.

The court of Chancery is not the proper tribunal for calling in question the rights of a corporation, as such, for the purpose of declaring its franchises forfeited and lost.

The " Society for establishing useful Manufactures," owning the lands on both sides of the Passaic river at Paterson, the seat of the manufactories, where the tide does not ebb and flow and the stream is not navigable, as the riparian proprietors, are entitled to the use of the stream. They have in it a property, growing out of the ownership of the soil, as sacredly regarded by the law as the right of soil itself; and a right to enjoy it without diminution or alteration.

The right is not confined to the use of so much water as may be necessary for their present purposes. They have appropriated to themselves the use of the stream, and have a right to take out the whole of it for the purposes of their manufactories; provided it is, after being used, again restored to the bed of the river for the benefit of those below; and provided, also, that no one having prior rights is thereby injured.

Every man has the right to have the advantage of a flow of water on his own land, without *diminution or alteration;* but an adverse right may exist, founded on the prior occupation of another. The right is usufructuary; a right to the flow of water, not to the water itself.

The Morris Canal Company, by using the bed of the Rockaway (a branch of the Passaic) as part of their canal, introducing into it the waters brought from lake Hopatcung and other sources, mingling them with the waters of the Rockaway; and on leaving it, taking out water to supply their canal, which is not again returned into the stream before it passes Paterson; do not injure the rights of the Society for establishing useful Manufactures at Paterson, provided they take out no more water than they bring in, and the flow of water at Paterson is not thereby diminished.

The rights of the Canal Company are subject to the prior rights of the Society, and must be exercised in such manner as that the Society thereby sustains no injury.

*Semble.* That the legislature have not power, by a subsequent act, to authorize the taking by a corporation, of streams of water or other property, previously appropriated by charter to the use of another corporation, and essential to the object of the prior grant.

Past injuries are in themselves no ground for an injunction: the province of the injunction is, not to afford a remedy for what is past, but to prevent future mischief. If the injuries were continued, or the right to continue them set up and persisted in by the defendants, this court would, if the facts were properly established, interfere by injunction effectually to protect the complainants.

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

The power of the court to grant injunctions in case of nuisance is unques-
tionable; but the exercise of the power must always rest in the sound dis-
cretion of the court, to be governed by the nature of the case.

THE controversy in this case is between two incorporated com-
panies. The Society for establishing useful Manufactures was
incorporated by an act of the legislature in the year 1791, with
a capital stock not to exceed one million of dollars, "to be em-
ployed in manufacturing or making all such commodities or arti-
cles as shall not be prohibited by law, and to that end in pur-
chasing such lands, tenements and hereditaments, and erecting
thereupon such buildings, and digging and establishing such ca-
nals, and doing such other matters or things, as shall be needful
for carrying on a manufactory or manufactories of the said com-
modities or articles."

The Society was also invested with power "to acquire, pur-
chase, receive, have, hold and enjoy, any lands, tenements, he-
reditaments, goods and chattels, of what kind or quality soever,
to an amount in value not exceeding four millions of dollars, and
the same or any part thereof to sell, grant, demise, alien and
dispose of."

The bill states that in 1792 the Society went into operation,
with a capital of about two hundred and ninety-four thousand
dollars. That in the same year and the year following they pur-
chased about seven hundred acres of land at and near the great
falls of the Passaic river, in the counties of Essex and Bergen,
and selected it as the principal seat of their manufactories. They
constructed a canal to take the waters of the Passaic from the bed
of the river and direct them through their lands, for the purposes
of their incorporation. They afterwards constructed a dam across
the river, and also a basin or reservoir, from which the water was
taken into the canal. They also purchased the bed of the river.
In 1807 they constructed a second canal, below the one above
mentioned. The grounds adjacent to the canals form sites for
the erection of manufactories; some of which have been let out
to individuals, with a reservation of rent to the Society. Besides
the sites now occupied, there are on the two canals now erected
water privileges not sold nor leased, amounting to twenty-nine
mill powers, each worth to the Society four hundred dollars per
annum, or in fee four hundred thousand dollars. The lots al-

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

ready appropriated to manufacturing purposes on said canals, with the buildings and machinery thereon, are worth eight hundred thousand dollars and upwards. The bill goes on to state that other improvements, and the establishment of new and additional manufactories are contemplated, under the confident expectation that the State of New-Jersey will preserve inviolate its pledged faith, and that the waters of the Passaic will be allowed to continue to flow in their natural channel until they shall be appropriated by the Society to the furtherance of the grand objects of their incorporation. Under the same just expectation the district has been incorporated, and the town of Paterson has grown up, and now contains a population of eight thousand inhabitants, a great portion of whom are directly or indirectly concerned in and benefitted by the manufactories there established.

The bill then charges that in 1824 the defendants were incorporated by the legislature of the state, with power to construct a canal between the Passaic and Delaware rivers, and with a capital of one million of dollars. That books of subscription were opened and upwards of seven millions of dollars subscribed, but that the amount of actual bona fide subscription was only four hundred thousand dollars; and that some shares were afterwards subscribed and taken. That the Canal Company went into operation, and have excavated the greater part of the bed of the canal. They have constructed works and machinery in the Rockaway river near *Dover*, and thrown a dam across the river for the purpose of leading the water into their canal. They have erected works at *Powerville* for the same purpose, and threatened that they will at any time hereafter, as they may have occasion, turn the waters of the Rockaway at both those places into their canal. And that about the *middle of July last*, also on the *27th and 28th July*, and in the *latter part of August and fore part of September*, they caused large quantities of water to be drawn out of the Rockaway—sometimes for the purpose of trying their inclined planes, and at other times for the purpose of puddling their canal—by means whereof great, sudden, and unusual depression and diminution of the quantity of water in the said Passaic river have been experienced at Paterson, and the manufactories there prevented from performing their usual operations, and some portion of the machinery has actually stopped for the want

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

of water. That the Canal Company threaten to take water at other places, and from other branches of the Passaic river. That the works established at Paterson, with those now in contemplation, will, during the summer months, require all the water of the river; and that if the Morris Canal and Banking Company are permitted to take the water of the Passaic for their canal, they will greatly injure the complainants, without being able to compensate for the injury. The bill denies that the water to be brought by the Company from lake Hopatcung into the Rockaway, will be in any wise equal to the water necessary to be taken by them to navigate the canal to Newark; and insist that even if it should be equal, the Company have *no right to commingle* the waters of the different streams, or permanently to *divert* the waters of the Rockaway, and substitute therefor the waters of the Hopatcung, thereby involving the rights of the parties in confusion and difficulty. That the Society are entitled to the natural flow of the river, without liability to the dangers that may result from any interference on the part of the Company. The bill then prays that the Canal Company may be *injoined* from diverting in any wise any of the waters of the Passaic or its tributary streams, and that an account may be taken of the damages already sustained.

The defendants' answer was read at the hearing, and also a variety of affidavits on both sides, to show the state of the water in the Rockaway and Passaic at the times when it is alleged the greatest depression took place, and to make manifest the injury occasioned by such depression. These will be more particularly adverted to hereafter if necessary. It is sufficient now to say, that the defendants, in their answer, insist that the Society for establishing useful Manufactures is no longer an existing incorporation. That many years ago they abandoned the establishment they had formed, and all operations connected with it, and thereby became virtually dissolved; and that the manner in which their operations are now conducted, and the mere having of lots and water privileges, is not in accordance with, but contrary to the spirit of the charter, and is of itself a forfeiture of the grant. They say further, in their answer, that in making the canal it was found necessary to introduce the waters of the Hopatcung lake into the Rockaway; and they admit that they have caused

to be erected dams across the Rockaway at *Dover* and *Power-ville* for the purpose of turning again into the canal such of the said waters as may be necessary to supply the same. They admit that such of the waters as shall be taken out at and below Pow-erville will not be returned into the Passaic till after it shall have passed the town of Paterson; but insist, nevertheless, that the water passing over the falls at Paterson will in nowise be dimin-ished, inasmuch as the waters of the Hopatcung lake and one of the head branches of the Raritan, which will be let into the ca-nal, will be more than that taken out. In answer to the charge of taking the water, and the injury sustained thereby, in July, August and September, 1829, they say that on or about the 11th day of July the water was gradually let into the canal from the Rockaway, for the purpose of trying one of the inclined planes: the experiment was made on the 15th of July, and the water immediately returned into the Pompton branch; and that all the water afterwards taken in July was immediately discharged through Cook's creek into the Rockaway. That during the lat-ter part of August and fore part of September no water whatever was drawn from the Rockaway for the purposes of the canal. And they expressly deny that any diminution of water was ex-perienced or existed at Paterson in consequence of their experi-ments; and allege that if any scarcity was felt it must have been owing to a defect in the Society's dam or some other cause.

*Mr. Wood*, for the complainants. The objects of the bill are to obtain an injunction to restrain "The Morris Canal and Bank-ing Company" from diverting the waters of the Rockaway (a branch of the Passaic) from the works of "The Society for es-tablishing useful Manufactures," at Paterson: and satisfaction for damages already sustained. The Society was incorporated in 1791, in perpetuity, with ample powers, and provision against forfeiture by *non-user*. They selected the great falls of the Pas-saic as the principal seat of their manufactories, bought seven hundred acres of land, with the mill-seat and bed of the river Passaic; which is here a private stream, not subject to the *jus publicum* of navigable waters, and capable of becoming private property. In 1792 they constructed their first canal or raceway;

21

Oct. 1830.

———

Soc. for estab-lishing Man-ufactures
v.
Morris Canal Company.

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

in 1807 a second, and in 1827 a third; affording sites for manufacturing establishments capable of employing all the waters of the river. They erected a manufactory in 1792, and carried it on themselves until 1796, when finding it unproductive, they ceased manufacturing, changed their mode of operations, and adopted another plan of effecting the object of their incorporation, by leasing out water power to individuals for manufacturing purposes. The defendants say that by doing this the Society have forfeited their charter. The third and fifteenth sections of the charter, it is true, contemplate that the Society would carry on manufactories themselves: they are authorized to do so, but there is nothing imperative. The charter also contemplated their operating through the medium of lessees; for there is power expressly given them to demise their real or personal estate, under which they have acted in leasing their water power: *Rev. L.* 109. The means are immaterial, so that the great object of the charter, " the establishment of useful manfactures," is effected. And it cannot be said that, because they have not done *all* they were authorized to do, they have forfeited their charter: *Opin. Ch. Williamson, The Society* v. *The Morris Canal,* pp. 18, 20. There is likewise a provision in the charter for incorporating a district around the principal seat of the Society, six miles square, with various municipal powers. The object was to build up a manufacturing town; and under the plan adopted a town has grown up, containing eight thousand inhabitants, which is now the Manchester of the United States.

The first inquiry is, what right have the complainants to the waters of the Passaic? They own the land, the bed of the river, and the canals: have appropriated the water to their use, and enjoyed it, thirty years before the Morris Canal and Banking Company were incorporated. As riparian proprietors, they have acquired a title to the water without any diminution: *Ch. Williamson's Opin.* 30. They also have a charter right, under the faith of the State, guaranteed by the Constitution of the United States. And this right is equally protected in the hands of their alienees or lessees: *Bank Case,* 4 *Wheat. R.* 316; ib. 518, *Dartmouth College;* 7 *Cranch's R.* 164, *The Brotherton Indians.* It is objected that these lands were purchased under a general power in the charter, and stand on the same footing as

all other lands in New-Jersey. We admit, as a general principle, that private property, land and water, may be taken for public use, making just compensation; but this does not apply to property already vested in a company under a charter. There is property exempt from this liability. It is so, when the taking of the property would impair the obligation of a contract, or defeat the purposes of a former grant. The legislature could not authorize another company to make a railroad on the bed of a turnpike : this would be a violation of the charter of the turnpike company. They could not authorize another company to make a canal, and take the waters of lake Hopatcung, making compensation to the Morris Canal Company : this would defeat the object of their incorporation. Nor could the State authorize the Morris Canal Company to take the waters of the Passaic ; because it would be taking away the very means by which the Society for establishing useful Manufactures are to carry into effect the object of their institution : *Opin. Ch. Williamson*, p. 23. The legislature have no power, by subsequent enactment, to interfere with prior grants; and general words in a subsequent grant, are not to be construed to embrace particular streams, previously appropriated by charter, and essential to the object of the prior grant : *Angel on W. C.* 151 ; 17 *Johns. R.* 195. A private corporation or franchise is property : it cannot be taken away on pretence that it is wanted for great public purposes. What may not be done directly, cannot be done indirectly. If the legislature cannot take away the franchise, neither can they take away the property which is essential to the exercise or enjoyment of the franchise. We have thus established the right of the Society to the use of the waters of the Passaic.

The Morris Canal and Banking Company was incorporated in 1824. The injury of which we complain, is, that they have taken out of the Rockaway, and other tributaries of the Passaic, as much water as they wanted, *ad libitum*, to the injury of the water power at Paterson ; and this not unavoidably, for they might have made an aqueduct to pass over the Rockaway, and avoided an intermixture of waters, and confusion of rights, that may occasion interminable controversy, and serious injury to the rights of the Manufacturing Society at Paterson. But they have purposely locked down into the Rockaway above Dover, made

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

the bed of the river a part of their canal; and erected a dam and works there, and at other places, to enable them to divert as much of the waters of the Rockaway as occasion may require, to fill their canal, and supply it to the tide water at Newark. By means of these works they took water out of the Rockaway and turned it into their canal, in July, August, and September, 1829.

The last hearing before the Chancellor on this subject was in August, 1829. There is much contradictory evidence, but on one point there is no dispute : that on the 13th and 14th of July, 1829, they did take water from the Rockaway at Boonton, and let it into the canal, to try their inclined plane at Pompton, and kept it in for some time. Here was an actual withdrawal of a large quantity of water from this branch of the Passaic. A depression of the water took place, and was complained of, at Paterson : and the only question is, what occasioned it ? the dry season, or the taking of the water out of the Rockaway ? There was nothing in the season to account for it; and the burthen of proof, that this effect did not proceed from so obvious a cause as the withdrawal of the water from the Rockaway, is on them. The evidence shows affirmatively that there was such a depression of the water at Paterson, and that it was occasioned by the taking of the water into the canal. When the depression of the water took place, and was complained of at Paterson, the dam was examined, and found to be in good order : the cause of the depression was sought for, and it was ascertained that the waters had been thus diverted into the canal. There was also a depression of the water at Paterson on the 27th and 28th July. These depressions were sudden. The water fell ten or eleven inches. At these two periods, the diminution of water was experienced to such an extent, as to obstruct the working of the mills at Paterson. They did not at the time know of the canal being filled; but on examination found the canal filled with water from the Rockaway, through the works at Boonton. The defendants contend, that the depression at Paterson was occasioned by other causes than the diversion of the water into the canal, and their witnesses depose that at certain points on the stream there was no depression of the water observed. The fact that water was taken in the middle of July, is not disputed ; yet they deny that it was taken the latter part of the month. A number of witnesses

prove expressly, that they saw the water running into the canal on the 26th, 27th, and 28th July; and others, that at that period the Rockaway fell suddenly, and the water was so low at Paterson that the mills could not work.  These facts are so positively testified to, that it is difficult to doubt.  Yet witnesses on the part of the defendants, swear that there was no water let into the canal at that time.  This negative evidence cannot outweigh the positive evidence on this point; but it shows how easy it is to cast a shade of doubt over a plain case, and how readily and how secretly the waters may at any time be withdrawn, by means of the works erected by the Canal Company, the manufactories at Paterson obstructed, and Paterson ruined.

As to injury since the last hearing, in August, 1829 :—The evidence taken since the filing of the present bill, proves, by the concurrent testimony of a number of witnesses, that there had been water in the canal since the middle of July : that on the 27th and 28th of August there was three feet of water running in the canal: that on the 12th September the water of the Rockaway was again turned into the canal, and on the 14th the water in the canal was three feet deep: that on the 26th, 27th and 28th of August, Crane's mill could not go : that the water in the Passaic was lower than it had been in twenty years, or within the memory of the witnesses : and on the 14th September it was the same case ; the waters were so low that the mills could not go. Another set of depositions show, very conclusively, that the taking out of the water to fill the canal, occasioned the depressions in the Rockaway and at Paterson : that although there was no drought, yet the Passaic at Paterson was never known to be so low as the last season, in July, August, and September.  These three sets of depositions, establish the facts, of the withdrawal of the water by the canal ; the depression in the Rockaway and Passaic ; and the diminution of the water power at Paterson, in consequence of which some of the mills were stopped and others obliged to go only at half speed, and very considerable damage sustained by the Society and the manufacturers at Paterson. Some of these depressions took place on Mondays, and it is attempted to ascribe them to the retention of the water in the milldams over Sunday.  But it is proved that the usual depression on Mondays from that cause, was from one and a half to two

Oct. 1830.

Soc. for establishing Manufactures
v.
Morris Canal Company.

Oct. 1830.

Soc. for establishing Manufactures

v.

Morris Canal Company.

inches, which would fill up in the course of the day; but the depression the last season was from nine to eleven inches, and not confined to Mondays or Tuesdays, but lasted with little variation for nine weeks. Beside the Rockaway, several other tributaries of the Passaic (Bear brook, Cook's mill stream, and Esler's mill stream) have been turned into the canal, by means of works and contrivances erected by the Canal Company. With all this evidence before us we are gravely told that the Morris Canal Company have done no injury, and do not intend to do any injury to the manufacturers at Paterson, and this court ought not to interfere to protect the industry and future interests of a population of eight thousand inhabitants, and prevent the invasion and final subversion of their rights.

It is said by the Canal Company that we have no cause of complaint or apprehension, because, although they have constructed works and contrivances to divert water from the Rockaway, yet they intend to bring into the Rockaway, as much water from lake Hopatcung, as they take out to fill the canal. The evidence shows that they have not yet done so. They have taken out water and brought in none; and we believe they will not be able to do it in future: that lake Hopatcung will not be sufficient, during the summer months, to supply the canal in both directions, to Easton and to Newark; and if it should, that sufficient water could not be introduced through the feeder to supply the whole extent of the canal. In September there was a full discharge of water into the feeder, and the head waters of the Raritan were turned in at Drakeville, yet the water only reached to Dover. What is the answer to this? They give us figures; calculations made by an engineer who undertakes to guage the quantity of water issuing from the lake. As well might he undertake to measure the quantity of water rushing over a cataract, or Æolus to measure the winds. There is no reliance on such calculations, based upon theories which are ever contradicted by facts. The engineer of the Company himself admits, that to supply the canal, they must resort to streams supplied by leakage from it. It is ten miles from the lake to the Rockaway. The leakage of the first five will fall into the head waters of the Raritan. It is only the leakage of the last five miles that would fall into the Rockaway if it could reach it. But in conveying water

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

through a canal over a porous soil, much of it will sink into the fissures of the earth without contributing to the supply of any stream, and much more will be exhausted by evaporation. If the canal was filled from the lake, a portion only of this water could reach the Rockaway. It is not practicable for them to bring as much into the Rockaway at Dover, as they must necessarily take out to fill the canal again and supply leakage and evaporation to the tide water at Newark. The pretence that they will bring in as much water as they take out, is a fallacy, having no foundation in truth or the nature of things, urged here to obscure the case, and conceal the fact, that they fall into the Rockaway at Dover to procure an additional supply of water to support the canal to Newark. The Company are involved in this dilemma: if lake Hopatcung will afford a sufficient supply for the canal, then there is no necessity of taking our water from the Rockaway—they can pass over it in an aqueduct: if the lake is not sufficient to supply the canal through its whole extent, then they must necessarily take out of the Rockaway more water than they bring in. By injoining them from taking this water, you confine both parties to their respective rights, and no one will be injured. You do great good by preventing confusion and uncertainty.

Upon plain legal principles we are entitled to the flow of the whole of the waters that in their natural course fall into the Passaic, without diminution or alteration. A riparian proprietor above has a right to use the water, but he cannot divert it even on his own ground, without returning it to the natural channel before the stream leaves his land: *Brearly* v. *Shaw*, 6 *East. R.* 208; *Balston* v. *Bensted*, 1 *Camp. N. P. R.* 463; *Merritt* v. *Parker*, *Cox's N. J. R.* 463; *Waggoner* v. *Shaw*, 4 *Dal. R.* 211; *Gardner* v. *Newburgh*, 2 *John. C. C.* 162, 164; *Ch. Williamson's Opin.* and cases there cited. Yet the Canal Company contend they have a right to take these waters into the canal and carry them past the seat of our manufactories at Paterson. They say, we do not injure you, because we bring into your stream as much as we take out. If this was admitted, it is no justification, for we are entitled to the flow of *the same identical stream,* and not to other water they may choose to bring into it. We deny that they have this right of substitution. The great rule of property is based upon identity; it is of the essence

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

of property. Although a right to water is not like a right to goods and chattels, because the water itself is transient; yet the right to a flow of the waters of a particular stream, is like the right to an easement, or way leading to land: a man has the same right to it that he has to the property to which it leads, and he through whose land it passes has no right to take it away and give another in place of it. If they can divert part of our stream, they may divert the whole, and give us another. It is no answer to say they are equal. Suppose the sources of the substituted stream should fail, would it then be no injury? The Canal Company intend to take water from the Rockaway at Dover to supply the canal to tide water. If they are permitted to do this for *twenty* years, they acquire a perfect right. If after that lake Hopatcung fails, all we could have would be gone; and having thus acquired a perfect right to maintain their dam and works, and to divert our water, they may do it ever after, and the injury to us is irremediable. To prevent this, we seek an injunction.

The law abhors an intermixture of property, and a party who attempts to break up the lines of distinction is chargeable with the highest amount of damages: *Hart* v. *Teneick*, 2 *John. C. R.* 108; *Armory* v. *Delamirie*, 1 *Stra.* 505; *Lupton* v. *White*, 15 *Ves.* 435; 2 *Ves. and B.* 265; *Pringle* v. *Taylor*, 2 *Taunt.* 150. He who intermixes his property with that of another, so that it cannot be separated or the quantity of each ascertained, forfeits what he brings in. If there is uncertainty in this case, the Canal Company have occasioned it. They have intermixed the waters for the purpose of getting the command of our stream, that on pretence of bringing in water they might take out what they may require. Who is to measure it? How is it to be ascertained that they take out no more than they bring in? We are at the mercy of the Company, their agents, boatmen, or strangers. They may withdraw the water to our prejudice, and no one be found to say who did it. The power this Company will have of taking the water at any time, hangs like a calamity over the town of Paterson, suppressing its enterprize and withering its future prospects. The injury is too impalpable to be redressed at law. Suppose the business of the town arrested by the diminution of the water power, the poor thrown out of employment,

contracts broken up, credit prostrated, and property depreciated. These matters are not relievable at law : 1 *John. C. R.* 611. It is a case that can only be redressed in a court of equity, and presents proper grounds for relief. The course is a plain one ; each party should be confined to the use of their own waters, and the matter will be put at rest.

**YALE LAW LIBRARY**

*Mr. D. B. Ogden*, for the defendants. The complainants say, the faith of the State is pledged to support their pretensions. If I really thought so, I would say nothing against them. It is true, the charter is a contract ; on that ground only can it be brought within the provision of the Constitution of the United States, relative to the power of the States. It is a contract between the State on the one part, and " The Society for establishing useful Manufactures" on the other. The State has granted this charter to the Society, in consideration that the Society on their part should do and perform certain acts deemed beneficial to the State. The Society must show that they have performed their part, *strictly*, before they can require fulfilment on the part of the State, or claim its protection. This is a sound principle of law and morals, and applies with peculiar force to agreements made by a sovereign State. If a grant be made by the King, or Parliament, upon *a misrepresentation*, the grant is void. The same doctrine applies to States. It results, that if a grant be procured for one purpose, and it is used for another, the grant is void : it cannot be so used. The great object of the State in granting the charter to the Society, was, not merely to enable them to hold lands in perpetuity, but it was, that they should employ their capital in manufacturing. All the privileges were given to the Society on this condition ; and the condition being broken, the grant ceases. The facts in this case are, that in 1792 the Society erected a mill, and commenced manufacturing. They discontinued their operations in 1796. From this time they ceased to be a corporation. If they had begun under the charter as they are now going on, it would have been a fraud on the legislature, and their charter would have become void. It follows, that when they cease to manufacture themselves, their charter is at an end. It is said that their rights are saved by the

Oct. 1830.

Soc. for estab-
lishing Man-
nfactures
v.
Morris Canal
Company.

provision, that no *non user* shall work a forfeiture. But this is not a question of non user, but, whether the Society, by ceasing to carry on manufactures themselves, have not surrendered their charter rights. The moment the end of the institution is abandoned, it amounts to a surrender of their charter : *Slee* v. *Bloom,* 19 *John. R.* 474. A surrender is an act *in pais :* 2 *John. C. R.* 226.

We are told the charter expressly gives the Society the power of leasing real estate. But if their charter terminated when they passed the resolution to discontinue manufacturing, their leases are void. What lands had they a right to lease? Only those that are necessary to the great end of their incorporation. When the end is abandoned, the means must go with it. The legislature intended to be liberal, but they expected good faith. The Society say in their bill, that they *are* carrying on manufactures. But where, and how? In 1814 they subscribed to the stock of manufacturing companies. Then from 1796 to 1814 they had no concern at all in manufactures. The Society has no right at all under their charter to be concerned in the stock of any corporate company. If they have not, then their subscribing for stock is a violation of their charter. In this country, corporations have no powers but those that are expressly given by the charter, or such as are necessary to carry the charter powers into effect. This is the rule in New-York, Pennsylvania, and Massachusetts. The third section of the charter prohibits the Society from dealing, trading, &c. They have a right to invest their surplus capital in stock of the United States, or the United States Bank, but no other right of investment whatever. But it is said the Society have certainly performed *part* of what they were bound to do ; that they have leased mill seats for manufacturing purposes ; and that is enough to save the charter. To hold and demise land is part of the charter *privileges,* but no part of the charter *duties.* The argument is, if they perform part they are entitled to the whole. Will it be pretended that they have still a right to make a lottery? or that they may establish any manufactory, however small, in any part of the state, and make a canal from thence to Paterson? The argument proves too much, and is therefore bad.

We insist that this Society never had a legal existence as a corporation. The charter, section sixth, requires that their original capital stock should be at least five hundred thousand dollars. The legislature thought they were securing capital to that amount for manufacturing purposes in New-Jersey. That was the contract. Yet they admit that the whole amount of their capital stock, when they commenced operations, was only two hundred and ninety-four thousand dollars. In this they broke the contract: they never had a lawful right to go on.

The bill in this case is not properly verified. There is, to be sure, the corporate seal, and signature of R. L. Colt as the governor of the Society; but the affidavits annexed relate to other matters, and do not prove the truth of the material facts alleged in the bill.

But supposing the Society to have all the corporate rights originally granted, and to have come regularly before the court, what is the relief prayed for by the bill?— 1. For an injunction. 2. For damages. I lay the second item out of the question, because this is a mere motion for an injunction to operate prospectively; and because damages are never a ground of relief in a court of equity: they are the subject of relief at law. As to the first item, the injury last summer is no ground for an injunction; the only ground for it is, to prevent *future* damage. Upon the affidavits, I remark generally. The Boonton falls are on the Rockaway river. The Passaic, for a number of miles, is a sluggish stream. The water running over the falls at Boonton cannot reach Paterson under three or four days. If the whole stream was stopped at Boonton, it could not be felt at Paterson under that time. Yet the depression is complained of in three hours after the water was taken out. The Society's engineer, J. L. Sullivan, says, if the Canal Company had brought in as much water as they took out, the depression would not have been felt at Paterson;—as if it had occurred after the water from lake Hopatcung was brought into the Rockaway. This was not the case. The want of water complained of was in July, August, and September; and no water from the lake was let into the Rockaway until late in September. The depression, therefore, does not prove that we do not bring into the Rockaway as much

Oct. 1830.

Soc. for establishing Manufactures
v.
Morris Canal Company.

Oct. 1830.

Soe. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

as we take out. From September, after the water came in from the lake, the canal was navigable continually to Newark, yet no complaint was made. Other witnesses speak of the depression in July, August, and September ; and some of them add, that the drought was greater the 29th September than before, and therefore the depression was not owing to the drought. Yet the same witnesses say, that the water was higher after the 14th September than before. Where did the additional water come from ? Unquestionably from the great pond or lake, when the canal was filled to navigate it to Newark. Does not this prove that we bring more water into the Rockaway than we take out ?

As to the propriety of granting the injunction. In *Roberts* v. *Ambley*, 2 *John. C. R.* 202, the correct rule is laid down by Chancellor Kent. There is no doubt of the power, but it is in the discretion of the court. If an injunction is granted in this case, what will be the effect ? You will put a stop to a work in which the State, and particularly the northern and eastern part, have a deep interest. To this work the faith of the State is pledged. It was renewed in 1827, when the State was made acquainted with the true situation of the Canal Company. In 1830 the public faith was again renewed. Under that faith a loan of seven hundred and fifty thousand dollars has been effected. Is this faith to be now violated ? And at what time are you called on to do this ? Why, at the time when you are asking foreign capital here to carry on works of internal improvement. If this step is taken, there will be an end of public improvements in New-Jersey for ever. But considering the case of the Morris Canal as a private affair, in which the faith of the State is not pledged, how stands the matter ? Injunctions are granted on the ground that the party fears and apprehends an injury. But two things must concur. 1. The danger must be *certain.* 2. The injury must be *irreparable.* Where it is a matter of doubt or uncertainty, or where the party can have an adequate remedy at law, this court will not interfere. In this case, it is doubtful if the injury will occur. In 1823 the legislature appointed commissioners to make a survey. They reported that the great pond (lake Hopatcung) was sufficient to supply the canal with water. This is important testimony. We prove the same thing by our

engineer, *Beach*, and others, and positively by Professor *Douglass*. On the other side, the witnesses say, the water of the lake is not sufficient. This leaves it a question of *doubt ;* if so, then it is not *certain :* and the court will not grant an injunction. This matter can hereafter be rendered certain, then why not wait until this certainty can be obtained. And if the injury happens, it is not irreparable : the remedy is plain. Suppose it should be found that the water is diminished at Paterson ; this court would at once injoin the Company from letting the waters of the Rockaway into the canal, and the injury is remedied.

But we are told that no matter how much water we bring into the Rockaway, we have no right to take any out. This brings us to a discussion of the rights of the Society as to the water. What are they ? The charter gives the Society no express right as to any stream of water. It gives them the right to purchase and hold lands. They have the right to water, as incidental, but this is no charter right ; it grows out of the authority to hold land, and their right as owners of the land : they have no other rights. A corporation is a *fictitious person*, nothing else ; the legislature give to this fictitious person the same right to hold lands as natural persons have. We deny that they have any other rights, in land or water, than other persons have. I do not stop to discuss the question whether the legislature have, or have not, the right to take this property for public use. It is not necessary. At a proper time we shall show, that the private rights of a corporation stand on the same footing as the private rights of individuals. The Society claim a property in the *water itself ;* there can be no such thing as property in water. It is like air, transient : there can only be a right to the use of water. None of the cases cited as to water, use the term " identity." The great principle is, that I have a right to use the water passing through my land, so that I injure none else. *Sic utere tuo ut alienum non lædas.* The question then is not as to identity of water, but, do I use it to the injury of my neigbbour ? And the great question in this case is, whether the water is taken so as to injure the Paterson works. If we bring in as much water as we take out, where is the injury? On this subject there is, to say the least, *doubt.* The Canal

Oct. 1830.

Soc. for establishing Manufactures
v.
Morris Canal Company.

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

Company can have no desire to destroy Paterson. Why should they? It is important to them that Paterson should prosper. If the operations of the Morris Canal Company do injure the Society, when it is made manifest, we must make an agreement with them, or abandon our works. This we offer. Ch. Williamson, in his *Opin.* 25, has decided this point. Then why urge this matter again? Why harass us, with this *third* application for an injunction, and in the face of former decisions? As to the fact: we bring as much water into the Rockaway, as is necessary to navigate boats to that river. What water do we take out? Only enough for navigation. But they say, you want more, for *leakage* and *evaporation* for forty miles; that will absorb a great portion, and you will then of course take out more water than you bring in. This does not follow. If we take out water for other purposes than mere navigation, we must take it out with a considerable *current.* Now, how do they know that we will not bring it in with a current. But suppose I am wrong, and that we bring in just enough for navigation; and take out of the Rockaway to supply leakage and evaporation to Newark; how stands the argument? Why, all we want in addition to what we bring in, is enough to supply leakage and evaporation. As to the leakage, it all goes to the Passaic, and they get it again. And admitting that we also want enough for evaporation; we have a resource sufficient for that. In the former bill, as well as the present, it is stated by the complainants, that the great inducement to select Paterson as the place for the location of their works, was the advantage of having the *Green pond*, the head of one of the branches of the Passaic, as a reservoir. Now what rights would the owner of that pond have, as between him and the Society at Paterson? Would he not have a right to dam it, so as not to diminish the discharge of the pond in time of drought? No doubt he would. If this be so; if the Green pond may be made a great reservoir, and the owner of the pond may use it in any way, not diminishing the quantity discharged in time of drought; then the Morris Canal Company, who are now the owners of this pond, and have the rights of the former owner, can dam this pond and use the water in like manner. Does it not then follow, that the additional quantity of water afforded by

this reservoir, will be sufficient to supply the leakage and evaporation of the canal to Newark? Of this there can be no doubt. The charter of the Morris Canal Company gives them the right to dam the Green pond. The Society have only the right to the ordinary discharge of the pond. If that can be increased, the right is expressly given to the Canal Company : Ch. Williamson's *Opin.* 25, 26. I look upon this whole matter to be *res adjudicata.* We therefore have a right to complain of this proceeding, and hope the motion for injunction will be overruled.

*Mr. Scott,* for the defendants. In an injunction bill, which prays for the high prerogative writ of the court, the complainant must set out a distinct title to the thing, the injury to which is the subject matter of complaint; and it must be properly verified, by the oath of the complainant or by other means. In cases of waste or irreparable mischief, the practice is, for the complainant to set out the title precisely, that it may be traversed. Such setting out of the title is a *sine qua non :* 1 *Mad. C.* 216 ; 6 *Ves. R.* 384. Now what do the complainants set out? They state, that they were incorporated, bought lands, mill seat and bed of the river at Paterson, &c. And how is the bill verified? By Mr. Colt, as the governor of the Society ; not the personal actor in the matters charged in the bill, but the creature of the incorporation. What does his verification amount to? There is not one of his acts set forth in the bill, nor does it state that he is the governor of the Society. What proof then is there, that they bought property, streams, mill seats, &c.? None. They produce no deeds : Mr. Colt has not sworn to it, or any one else. The other affidavits annexed to it prove nothing. *Collet* and *Carrick* swear only as to their own acts. There is no affidavit as to the material matters, of *right,* of *invasion,* and *injury,* set forth in the bill. This court can only judge on evidence : and there being none, of any right invaded, there can be no relief.

The complainants say that they are *rectus in curia ;* that they are entitled to relief, in the character in which they complain ; that is, in their corporate capacity. Where is their charter? It is gone. An abandonment of the objects of the charter, is, *ipso facto,* a dissolution of the corporation, especially as to

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

third persons.  They have no right to the *means*, after the *object* is abandoned.  If there has been such abandonment, the Society no longer exists.  In 1796 there was an actual abandonment of the object of the incorporation, by the resolution of the directors to discontinue manufacturing; a resolution which they had a right to pass, under the last section of the charter.  Since this they have not been known as a manufacturing institution.  They say they have leased water power for manufacturing purposes. The right to demise is ancillary, and incident to the right to hold lands; it is not a substantive right.  They have no right, under their charter, of dealing in water powers, as such, without reference to the great end in view : it is not the object for which they were incorporated.  Instead of going on with the object in view, they manufacture by *proxy*.  It is an evasion.  This *non user* is *evidence* of a surrender of their charter privileges.  They have not performed the stipulations on their part, and have now no claim to the faith or protection of the State.  The charter says, that non user of the privileges shall not be a forfeiture ; but it does not say, that non-performance of the condition, shall not be a forfeiture of the grant.  It is said this court cannot adjudge it to be a forfeiture.  True, this court cannot proceed by *quo warranto*, and render judgment of forfeiture.  But when the complainants come into this court, as a corporation, they must show that they have legal existence, or this court will refuse relief.  In the case in 19 *John. R.* 474, there had been no *quo warranto ;* yet it was there considered that the corporation had no existence.

If the Society have a right to come into this court, of what do they complain ?  An invasion of their chartered rights.  What is their nature, and extent?  The rights of natural persons are, security of person and property.  The rights of a corporation, or artificial person, approximate to these, but cannot transcend them. The rights of natural persons are of a higher order than those of a corporation.  As natural persons, corporations are permitted to acquire, hold, enjoy and transmit property : their right to property stands on the same footing as the right of natural persons.  It is said that the *waters* of this corporation are inviolable ; that they cannot be taken for public use, because it would impair the obligation of a *contract*.  Can it be, that the houses and lands

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

of a citizen, can be taken for canals, highways, &c. and yet those of a corporation be favored and exempt? Do not individuals hold their lands and waters by contract? *Private property* may be taken for public use. Is not the property of a corporation, or artificial person, as much private property as that of a natural person? And is not the faith of the State as much bound to protect the property of the one as the other? A corporation has a right to hold according to law, and in no other way. As alienees, they have the title of the alienor, and no more. Does the grant by the State to a corporation, of the power to purchase and hold the property, vary the case? Have not natural persons the same power under the general law? Are lands holden of the State in pure *allodium* inviolable; if not, how can it be said that the waters of the Passaic, purchased by the Society under the authority of the State, are inviolable? I refer to our statute regulating *Tenures, Rev. L.* 166; *Satterly and Mayhew* v. *Hamilton College,* 2 *Peters R.* —; *Jerome* and *Ross,* 7 *John.* 315. The charter of the Morris Canal gives a right to take streams: if that is constitutional, there is an end of this question.

But the complainants claim a right to the *identical* water. In 6 *East. R.* 206, Lord Ellenborough, in speaking of the right to water, uses the terms "without diminution or alteration." The one means quantity, the other quality, but neither means identity. The cases adduced to prove that chattels are not to be mingled, are inapplicable: because water is not property, it cannot be recovered as such. As to the right of diversion without diminishing the quantity, the question is already settled by the opinion of Ch. Williamson. The complainants say we have lessened the supply. Our answer denies it, and we produce the depositions of thirty-eight witnesses to the contrary. The evidence is before the court, and it is unnecessary to recapitulate it.

To entitle the complainants to an injunction, they must show well-grounded apprehension of certain, and irremediable injury. Admitting the right of the Society to the waters of the Rockaway and Passaic; the evidence produced by the defendants, the affidavits of Professor Douglass, of Beach and Mason the engineers, show, that the water of lake Hopatcung is sufficient for all the purposes of the canal, and that there is no danger of injury to

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

the Society. These affidavits are equal to those of J. L. Sullivan, Colt and others. There is, to say the least, uncertainty; and the power of granting an injunction cannot now be properly exercised. If a diminution of the waters of the Passaic, from the operations of the canal, should occur, it is not irremediable. The gates may be hoisted and the water restored: this court can set the matter right. It is said the Society are in danger, as the waters may be diverted by any one opening the gates. That would be an abuse, and is no argument against the proper use, of the water by the Canal Company. We pray that the injunction may not be granted.

*Mr. Southard*, in reply. It is important to recollect the history of this case. It commenced with the incorporation of the Morris Canal. The impression of the Society then was, that the Canal Company intended to sustain themselves without touching any waters of the Passaic. It was said, that the lake Hopatcung was sufficient to supply the canal. The applicants for the charter stated that they meant to fill it from that source. They so represented to the public and to the legislature. Such was the impression of the legislature, and the field book filed by the Company in the office of the secretary of state confirms it. No member of the legislature would have voted for the bill, had they supposed that the water power at Paterson was to be destroyed or injured. The canal was expected to terminate at tide water on the Passaic. After the charter was obtained it was determined to extend it to Newark, and subsequently an extension to Jersey City was contemplated. More water became necessary, and then this difficulty commenced. The Company located their canal, and erected works and contrivances to divert the waters of the Rockaway, and carry them past Paterson, to the injury of the manufactories. The Society, seeing the danger, then called on the late chancellor to protect them by injunction. The chancellor decided, that as no actual injury had yet been sustained, he could not grant it. Some months after, having by that time suffered injury, as we supposed, we applied again on the same bill. The chancellor intimated that it was necessary to file a new bill. We have accordingly filed a new bill, and produced additional proofs.

This is the whole proceeding, for which we are now reproached with having made a third application for an injunction ; and told that the matter is *res adjudicata.*

It is said the verification of our bill is defective. It is under the seal of the corporation, attested by R. L. Colt, as governor of the Society. The seal alone would have been sufficient : so says Justice Washington. Beside this, the affidavit of Mr. Colt is perfectly full. John Colt was the agent of the Society ; he and three others swear in the usual form : the others are lessees, they could swear in no other way. If this verification be defective, the court will order it corrected. The bill is of double aspect : it prays an account for injury done, and an injunction to prevent future waste. I shall not separate these matters ; the great question is, whether the Canal Company have a right to take our water.

As to the facts in this case : Is it true that the works have been erected, and the injury done ? I admit, that there is some contradiction in the evidence, but not such as to prevent a clear conclusion. It is proved and admitted, that at *Dover,* where the canal crosses the river Rockaway, the Company have erected a dam and locks. They have here taken the *mastery of the whole stream.* We next come to the *Bear brook :* they take the whole waters of that stream. At *Powerville* there is a dam by which the whole river can at any moment be turned into the canal. Now what was the object of all these contrivances ? If it was only to take out as much water as they bring in, would not one dam have been sufficient ? It is admitted and proved that they had brought in no water from the Hopatcong until after the injury complained of in our bill. It is admitted and proved, that there has been water let into the canal in that quarter to try their inclined planes and for other purposes, repeatedly, in July and August, as well as in September, 1829. It is no matter whether this was done by the Company, or a stranger ; it is the *erection of the works,* of which the Society complain. They enabled some one to do the injury. It is *against these works,* calculated to divert our water, so that it will not be returned to the stream again until after it passes Paterson, that the power of this court is sought to be directed.

Oct. 1830.
_____
Soc. for estab
lishing Man-
ufactures
v.
Morris Canal
Company.

The water was taken at three several times in large quantities, and at other times more or less every day, throughout the months of July, August, and September. Was it taken to such an extent as to affect us materially? This is denied; but the denial only relates to the month of July: the taking of water in August and September is uncontradicted, even by the answer of the defendants. The defendants' witnesses, with the exception of *Smith*, speak as to July only. The Rockaway forms about one third part of the river Passaic. What portion of this did they take? They took enough to fill the canal, ten miles in length and three feet deep, in one day. It must have taken all the water of the Rockaway. This was done frequently, to try their inclined planes, which as to water is a most wasting operation; and yet they say it could not be felt at Paterson. The defendants produce thirty-eight witnesses, who, as they say, declare there was no diminution of water. With the exception of *Smith*, and the gentleman at the *Little Falls*, there is not one who had his attention particularly directed to it. They *did not observe it*. This may well be. Mr. Beach was at Paterson, and he *did not* see it or hear of it. At the Little Falls, and at the freeholders' bridge, those who were at work there took no particular notice of it. And what does all this negative evidence prove? Nothing, in opposition to the affirmative evidence on the part of complainants. Our chain of evidence is complete. *Smith* began to mark the height of the water the first of July: he has given us the result. By his marks we find, that on the 11th, 12th, and 13th July, there was an actual depression of from twelve to fourteen inches: on the 27th and 29th, the difference was nine inches: on the 6th September, seven inches; and on the 13th and 14th, there was one day six, and one day twenty-eight inches. Other witnesses speak of the depression in August and September: some of them saw the children playing in the bed of the river. *Van Duyn* kept marks: he says the water fell twelve inches. At the five bridges a boat was left dry on the shore in the space of one hour. *Duryea's* meadow was wet: by the withdrawal of the water it became dry; and wet again when the water returned.

What was the effect? Kitchel's mill is at the mouth of

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

Cook's brook: he (Kitchel) says, that on the 27th and 28th August, he could not grind for want of water. Crane's mill is similarly situated: it could not be worked on three several occasions. They did not know why it was so: they sought for the cause, and found it in the canal works. Post says the streams were lower at those periods than he ever saw them; Speer says, six inches lower; and Collet says, the water was fifteen or sixteen inches lower than he had ever known it. And what is the testimony in relation to Paterson? J. Colt says there was a diminution of the water there of ten or eleven inches. Rogers, Godwin, and others, prove that some of the mills were obliged to throw off part of their machinery; and one mill was actually stopped, from the 28th August to the 14th September. J. L. Sullivan was sent to examine the cause: he found it, not at the dam of the Society, which had been raised and repaired in July, but at the works of the Canal Company. In this, Blake sustains Sullivan. It is said, we complain of the depression in three hours after the water was let into the canal, which could not be. This is not so: none of our witnesses fix it at less than twenty-four hours. In consequence of this want of water, contracts were broken, and leases violated. That the Society *have suffered*, is now no longer a matter of doubt. And we come before the court in the situation in which the late learned chancellor said we should come.

It is true, that during the period above alluded to, in which the Canal Company were continually operating, more or less, they had brought no water into the Rockaway from the Hopatcung: and they say that, if the water of the Great pond had been running into the canal in July, August, and September, it would have helped us. It might, in some measure; but would it have protected us from injury? We think not. We believe that the Hopatcung is not sufficient to supply the canal. Who has measured it, and without admeasurement who can tell? They give us calculations made by Professors Renwick and Douglass; between their estimates there is a difference of one half in quantity: yet upon such calculations you are asked to doubt, and leave our rights to destruction.

They calculate, too, upon the whole water of the lake; as if

Oct, 1830.

Soc. for estab-
lishing Man-
ufactures
      v
Morris Canal
  Company.

they had a right to take the whole supply of that reservoir for the use of the canal. That lake is the source and supply of the Musconetcong creek, on which there are forty-five mill seats. They have forgotten these mills, or they desire to use the head waters of the Musconetcong only to *Dover*, on the eastern section of the canal, and then take our water to supply them to Newark. They want to break us down, to avoid difficulty with the mills on the Musconetcong.

They say they will take out just as much water as they bring in. Is there any evidence that they will take out no more? They will empty into the Rockaway a *lock full* at the passage of every boat, and take out a *canal full*, enough to float their boat to Newark. Their dam commands the whole stream; who is to prevent their taking out more than they bring in?

You are told, that if you injoin now, the faith of the State will be violated. Not so. If their water from the lake is sufficient, they can pass over the Rockaway in an aqueduct, and not interfere with our water: there is then no necessity of taking it. But if the water of lake Hopatcung is not sufficient, then they must necessarily take our water, and injure us, and the question is settled. If they are restricted to their own water resources, and they are insufficient to sustain them, and they sink, it will be by their own folly and default, in deceiving themselves, the public, and the legislature; and they will fall justly.

Having shown the wrong and injury, the question arises, by what authority is this wrong done? They answer, the charter: we deny it. The charter, we say, contemplated no such thing. The commissioners appointed by the legislature, reported, that there was water enough in the lake Hopatcung to supply the canal to tide water on the Passaic. The small streams which the commissioners said might be taken to increase the supply, are, the head waters of the Raritan, and the tributaries of the Musconetcong and the Delaware. They were studious to show that the head waters of the Passaic were not to be interfered with. Green pond, one of the sources of the Passaic, is not mentioned in the communications to the legislature previous to the passing of the law; but it is found in the law itself. The mentioning it there, proves that the legislature did not intend that any other of

the waters of the Passaic were to be used by the Company. And all they are entitled to of this pond is, only the advantage of it as a reservoir, or the use of the additional water that may be accumulated there in the wet season : its ordinary flow is not to be interrupted.

But if the Canal Company were authorized by their charter to take the waters of the Passaic, they have yet acquired no right under it.   By the sixth section of the charter they are directed to make a map of the lands, waters and streams required for the use of the canal, and file it in the secretary's office, with an affidavit of the engineer that the premises are necessary, and not more than is requisite for the purposes of the act.   After doing this, they can only take what they have so described.   We have here the survey from the secretary's office : it contains nothing to justify a pretence that they are to take any water of the Passaic or its tributaries.   They do not swear that they are necessary; if they did, it would be giving up this question.   They mention the *passing* of the Rockaway in the same way that they mention the passing of other streams.   Over all they pass in aqueducts, except the Rockaway.   They are also required to compromise and settle with the citizens before taking their property : they have not done, or attempted to do it with the Society.   In case of a failure of compromise, they should have resorted to the tribunal appointed by the act itself, the commissioners.   As to this tribunal, I do say, that, according to my view of the subject, it is *unconstitutional.*   It is taking away the *trial by jury.*   I refer to Judge Paterson's opinion, in the case of *Van Horne's Lessee* v. *Dorrance, 2 Dall. R.* 104.   But if it is constitutional to take our property in the way prescribed, the Company must first do what the charter requires.   They must appraise it, and pay us for it, and that in *money;* they cannot make us take *water,* brought from some other source, for our compensation.

I have looked at all their justifications, and think the Canal Company cannot find, in the report of the commissioners, in the act of incorporation, nor in a compliance with its provisions, any apology for the acts of which we complain.   The proceedings of the Company are an abuse of their corporate powers, and therefore a ground for injunction.   They assume the power to inter-

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

mix their rights with the rights of others, without their consent, and to their prejudice. Such an intermixture is the foundation of an action for damages, when it takes place. But when they say they will continue it, without end, then it is proper for the court of chancery to interfere. By this intermixture they create uncertainty as to our rights. Who is to measure the extent of our rights, and mete them out to us? This difficulty must occasion endless litigation, until by acquiescence or lapse of time our rights are extinguished. To prevent litigation is the office of an injunction. The injury of which we complain can only be arrested by the powerful arm of this court.

Our opponents say, that we are not in a situation to complain, for many reasons. 1. It is said we have not produced title. It is never required. We have set it out in our bill, and that is verified, which is sufficient. 2. It is said we were never legally incorporated, not having five hundred thousand dollars subscribed. The legislature incorporated the Society on the subscription of two hundred thousand dollars, previously made: but it is stated in the bill that the subscriptions were six thousand one hundred and twenty-two shares, upwards of six hundred thousand dollars. 3. Again, it is said we have surrendered our charter privileges, by a resolution in 1796. The *stockholders* never made such a resolution. They alone had power to dissolve, but they refused, and instead of it elected a new board of directors. 4. It is also said we have surrendered by *non user :* that this non user is *evidence* of a surrender. But when by express provision of the charter (*Rev. L.* 124) non user cannot *create a forfeiture,* can it be evidence of a forfeiture? Lastly, it is said we have abandoned the *object* of our incorporation, and therefore our rights are gone. The object was, to *establish* manufactures : this we have successfully accomplished.

The legislature, however, do not regard this Society as dissolved. They have recognized the legal existence of the Society, time after time, by a series of acts, resolutions, reports, and proceedings (which the counsel here recapitulated) from 1804 to 1826. In 1826 the State received a deed of conveyance from this same corporation : could it then be extinct? The Society can only be declared *non existent* by the operation of a *quo warranto.*

There is no such power in the court of chancery. No third person can come here and say, this charter has been violated, and is therefore void. Whether the Society have power to make a lottery or not, or whether they have power to make canals throughout the state, is not now the question; if it was, I should say they have the same power on these subjects as they ever had.

Having shown, as I trust, the existence of our corporation, I now proceed to show that our *title to the water* is complete. The object of the Society was, to establish manufactures. At that day, *water power* was the only means of carrying them on. Without this they could not succeed, and all other rights would be good for nothing. The Society took possession of the waters of the Passaic. I do not mean the *identical water ;* but I mean the waters of this *identical stream.* It was a private stream ; they bought it. The purchase of the banks would have been sufficient ; but they bought the bed of the river, and acquired a right to the natural flow of this stream. If the water could be withdrawn, or the flow of the stream diverted or changed, what did they purchase? Nothing ; or what was of no value. But they purchased the *water power* at Paterson. That consists of the uninterrupted flow of water from all the fountains or streams of water in their natural course emptying into the Passaic : combined with the descent or fall of water at Paterson, which constitutes water power. This is a species of property not unknown to the law, but capable of ownership, of intrinsic value, and like all other property entitled to protection. At that time the Society looked to Green pond as one of the tributaries of the Passaic, as appears by their minutes prior to their location. If we purchased the water power, and entered upon it, and used it twenty years, we have as good a title as any grant can give ; a title that no constitutional power can wrest from us : *Campbell* v. *Smith*, 3 *Hals. R.* 140. If we had no charter privileges, our rights are absolute. This is not the case of a mere purchase of lands, in *allodium* or otherwise ; but it is a case where the State, by granting a charter to the Society, for certain special purposes, has pledged its faith to protect the property of the Society lawfully acquired, and essential to the purposes of their incorporation. To this end we pray the injunction.

24

Oct. 1830.

———

Soc. for establishing Manufactures
v.
Morris Canal Company.

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

THE CHANCELLOR. In the consideration of this case, I shall assume that both corporations have legal existence. As it regards the defendants, no objection can be raised against their existence as a body corporate by these complainants. They have brought them into court as a company ; the direct object of the bill is to operate upon them as a company and in no other capacity, and so they must be considered by the court. So, on the other hand, the allegations of the defendants, that the Society is virtually dissolved ; that they are acting in direct opposition to the spirit of their charter ; that they are speculating in perfect security on the very extensive privileges granted them, without incurring any corresponding risk, or embarking any of their capital in the manufacturing and making of such commodities as are mentioned in the act of incorporation, and therefore their charter rights are forfeited and gone, cannot avail them at this time, or before this court. The case of *Slee* v. *Bloom,* 19 *Johns.* 474, was cited and relied on by the defendants' counsel, to show that a corporation might be considered in a court of equity as having forfeited or surrendered its charter, by doing or suffering acts to be done which destroy the end and object for which it was instituted. That case was decided by the court of errors, and reversed the decree of the chancellor as found in 5 *Johns. C. R.* The learned judge was of opinion, that the court of chancery was not the proper tribunal for calling in question the rights of a corporation, as such, for the purpose of declaring its franchises forfeited and lost ; and this, as a general principle, I take to be correct. But without admitting or denying the authority of the particular case cited, it is enough to say that the present one is not within it. In that case it appeared, among other things, that the stockholders had come to the resolution to abandon the factory and corporation altogether. No such fact is before me in relation to this corporation. The charter granted to the Society for establishing useful Manufactures, was exceedingly liberal. It was intended to promote a great national object, and well calculated to afford extensive protection to exertion and enterprize. It was created in perpetuity, and the ordinary and natural effect of nonuser was expressly provided against. How far the risk and enterprize of the Society are commensurate with the privileges and

immunities conferred on them; how far the mode of operation Oct. 1830. lately adopted by them comports with the spirit and intention of the charter; and whether any of their acts or omissions may legally be construed to amount to a surrender, abandonment, or forfeiture of the charter, are questions that properly belong, as I conceive, to another tribunal. They are matters upon which it does not become this court to express any opinion.

Soc. for establishing Manufactures
v.
Morris Canal Company.

Considering, then, both parties as properly in court, I shall inquire, in the first place, what are the rights of the plaintiffs, as exhibited by the case made.

The river Passaic, at the town of Paterson, is not a navigable stream. The tide does not ebb and flow, nor is the stream navigated by boats or craft of any kind. The Society, at the place selected as the seat of their manufactories, own the land on both sides of the river, and have had the possession for many years. They are the riparian proprietors, and upon plain and acknowledged common law principles they are entitled to the use of the stream. They have in it a property growing out of the ownership of the soil, which is ofttimes of more value than the soil itself, and at all times as sacredly regarded by the law. This being the case, they have a right to enjoy it without diminution or alteration. Lord Ellenborough, in the case of *Bealy* v. *Shaw*, 6 *East*. 208, says, " The general rule of law, as applied to this subject is, that independent of any particular enjoyment used to be had by another, every man has a right to have the advantage of a flow of water in his own land, without diminution or alteration : but an adverse right may exist, founded on the occupation of another." This right, at all times valuable, is to the Society vital. Their hopes and expectations not only, but their very existence are dependent on it. The right is not confined to the use of so much water as may be necessary for their present purposes. They have appropriated to themselves the use of the stream. They have a right to take out the whole of it for the purposes of their manufactories, provided it is again, after being used, restored to the bed of the river for the benefit of those below ; and provided also that no one having prior rights is thereby injured. Such I take to be the common law rights of the Society, independent of any additional privileges that may be secured to them by their charter.

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

What they may be, if any exist, it appears to me unnecessary now to inquire.

I propose now to consider the rights of the defendants, and how far, if at all, they interfere with those of the complainants; and whether, in the exercise of those rights, any injury has been done to the plaintiffs; and whether, in the further use of them, the plaintiffs will be so *certainly* and *permanently* injured, as to justify the interference of the court at this time by injunction.

And first, as to the rights claimed by the defendants. I do not understand them as claiming a right to the *ad libitum* or unrestrained use of the waters of the Passaic, or its tributaries, subject to the payment of a compensation or damages to the Society for establishing useful Manufactures. If such claim was set up, it would be necessary to inquire how far it could be supported as against the chartered rights of the Society. But I consider that question not properly before the court. They claim, under the act of incorporation, the right to construct a navigable canal from the Delaware to the Passaic. They claim the use of the waters of lake Hopatcong, and of the extra water of Green pond. They claim to bring the water from the Hopatcong into the Rockaway — to make use of that river as a part of the canal, and to take out of it again water for the use of the canal— not thereby diminishing the ordinary and natural flow of the water at the great falls at Paterson.

It does not follow, that, because a person as riparian proprietor has a right to the flow of a stream, and to use it for the purpose of manufacturing, or any other purpose requiring the use of water, that therefore no other proprietor or person shall be at liberty to use for the same or like objects the water above him. This would be contrary to natural justice and the reason of things. Each one has a right to the use, provided that in the exercise of such right he does no injury to his neighbour: 2 *Blac. Com.* 403.

Now if the Morris Canal and Banking Company make such use of the waters of the Passaic, or any of its tributary branches, as to occasion no diminution in the flow of the stream at the place where it is used by the complainants; and if in such use no injury whatever is done to the complainants; are they not ex-

ercising an ordinary and well established right? Does not the same privilege that is accorded to others belong also to them? It appears to me unquestionable that the defendants have such right as against the complainants, subject to the condition already stated.

But the Morris Canal Company claim the further privilege of introducing into the Rockaway the waters of the lake Hopatcung, and of one of the branches of the Raritan—and then of taking out of the Rockaway below so much water as may be necessary for the purposes of their canal; averring that the waters of the stream will be thereby in no wise diminished. The water thus taken out, it is admitted, is not to be returned until it shall have passed the great falls at Paterson. They say that the supply of water thus brought in, together with the extra. supply which they are authorized to take from Green pond, will in times of drought afford to the Society a more copious flow than they would otherwise have, and therefore that it will be a benefit. On the other hand, it is contended by the Society, that the Canal Company have no authority thus to commingle different streams and different rights; that they are entitled to the flow of the identical stream of water, not only without *diminution*, but without *alteration*; that if the claims of the Company in this behalf are sustained, the supply afforded by these substituted streams may in time diminish, and the property and immunities of the Company be jeoparded or ruined. This is supposed to present a question of novelty and importance. It certainly is not the case of a simple diversion of the stream for necessary purposes, returning it again to its natural channel when those purposes shall have been answered; but would seem to be rather a substitution of part of one stream for part of another. The principle that assigns to every thing capable of ownership a legal and determinate owner, is wise and salutary, and promotive of the great ends of civil society. This principle, however, can only be applied to streams of water in a limited sense. There is no such thing as actual property in running water. It is transient in its nature, and must be permitted to flow for the common benefit. The interest is rather of a usufructuary kind, but not the less absolute or vested on that account. To say, then, that a

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

person entitled to the flow of a stream of water through his land, is entitled to the flow of the very identical substance that issued from the original source, is an assertion of right not easily sustained. It would be tantamount to the ownership of the particular water itself—which cannot be. I do not understand Lord Ellenborough, in *Bealy* v. *Shaw*, to carry the doctrine thus far. His principle is, that every man has a right to the advantages of a flow of water in his own land, without having its quantity diminished, or its quality altered, by the operations of those who might be above him on the same stream. It is not pretended that the quality of the water to be let in from the lake Hopatcung and other sources, is in any way different from the water of the Rockaway. If then the defendants take from the Rockaway no greater quantity of water than they bring in, (and they claim a right to do no more,) will not the Society enjoy their privilege without diminution or alteration, or can they in any wise be injured? But, while the right thus to take the water of the Rockaway for the use of the canal, is accorded to the Company, I think it is easy to foresee that difficulties may arise in its exercise. Whatever these difficulties may be, and whatever may be the risk, and hazard, and loss attending them, they will have been sought by the defendants themselves, and not imposed by others. Their rights, whatever they may be, are subject to the prior rights of the Society for establishing useful Manufactures, and must be exercised in such manner as that the Society thereby sustains no injury. And, in fact, I understand this principle to be conceded. It was candidly stated in the argument by the counsel for the Company, that if in their future operations it became manifest that the Society was injured, the Company must either agree with them for the use of the water, or abandon their work.

The next inquiry is, whether the complainants have already been injured by the drawing off of the water, and whether such injury is continued; and if not, whether the apprehended danger is of that character as to justify the interference of this court by injunction.

And first, as to the fact of the injury, and its continuance. The bill charges that the Company, about the middle of July,

and on the 27th and 28th of July, and in the latter part of August and fore part of September, caused large quantities of water to be drawn out of the Rockaway, sometimes for the purpose of trying their inclined planes, and at other times for the purpose of puddling their canal, by means whereof great, sudden, and unusual diminution and depression of the usual quantity of water was experienced at Paterson. There is no doubt, from the evidence, that water was drawn from the Rockaway for the purposes of the canal, in the month of July, as charged in the bill, and again let into the river. But whether the stream, in consequence of these operations, was sensibly diminished at the great falls, and whether in consequence of it any injury was sustained by the complainants, are matters not so clearly established. There is much contradiction in the evidence, and if it were necessary to settle the facts at this time, I should have strong doubts whether this would be the proper tribunal to weigh and determine upon the mass of conflicting testimony that has been presented to the court. Whether the water was let into the canal at the times when a depression of water is charged to have taken place at Paterson, and whether such depression of water, if it actually took place, was occasioned by the operations of the canal, are also matters of dispute—and I deem it unnecessary to look into the evidence with a view of arriving at any conclusion in relation to them. The question of damages is not now under consideration. If, however, injuries were sustained by the complainants at the particular times charged, those past injuries are in themselves no ground for an injunction. The province of the injunction is not to afford a remedy for what is past, but to prevent future mischief. The effect of the injunction is preventive. If the injuries were continued, or the right to continue them set up and persisted in, this court would, if the facts were properly established, interfere, and effectually too, for the protection of the complainants. But the defendants make no such claim or pretence; and it is observable, that between the fore part of September and the filing of this bill in January, there is no complaint of any alleged violation of the rights and privileges of the Society.

It appears further from the case presented, that at the times when the water was let into the canal, as complained of by the

CASES IN CHANCERY

Oct. 1830.

Soc. for estab-
lishing Man-
ufactures
v.
Morris Canal
Company.

Society, there was no water brought into the Rockaway from the lake, and that the water was let into a section of the canal, not for the purpose of navigation, but of making some experiments upon the works of the canal; that the use of the water was *temporary*, and the water itself, or what remained, was returned into its natural channel. It does not appear that the water of the Rockaway will in future be withdrawn for these temporary purposes, preparatory to the navigation of the canal, without the water being brought at the same time from the lake Hopatcung into the Rockaway; nor, if it should, that the water of the river will be sensibly diminished, or any injury sustained by the complainants. Seeing then that some doubt, to say the least of it, rests upon the allegation of the complainants in regard to the alleged injury already sustained; seeing there is no certainty that the water will be in like manner again abstracted for the purposes of experiments; and the right of thus abstracting it for the purpose of navigation, to the diminution of the stream or the injury of the complainants—or in other words, without bringing in an equal supply, being disclaimed by the defendants; it would be, in my opinion, an indiscreet and injudicious exercise of power in this court to arrest, at this moment, *brevi manu*, the operarations of the Company. In the prosecution of this work they have expended among us a large amount of money: they have lately effected a loan, to relieve themselves from embarrassment, and enable them to complete their canal. It is a work in which a portion of the community is deeply interested, and which, if completed and in successful operation, may be of great benefit to the State. To grant an injunction against them now, in the manner and to the extent prayed for, would be at once to prostrate their hopes, and might result in an injury which the power of this court could never repair.

The power of the court to grant injunctions in cases of nuisance will not be questioned. There is a necessity for some preventive remedy, when it is ascertained that great or immediate mischief, or permanent injury, is about to be done to private property; and this is the foundation of the jurisdiction. But the exercise of the power must always rest in the sound discretion of the court, to be governed by the nature of the case.

The case presented is peculiar ; but it does not satisfy me of that pressing necessity, or that certainty of mischief, which would authorize an interference in a matter of such magnitude.

The Morris Canal Company are about completing their canal. The great problem, whether their means of supply will afford them a sufficient quantity of water, without causing any diminution of the water in the Passaic at the great falls, and of consequence injuring the complainants, must soon be solved.    Important interests are involved in the solution.    This court will afford to the Company its protection, so far as may be legally done, until the result shall be ascertained.    But the defendants must remember that they proceed upon their own responsibility, and at their peril.    If there be any hazard or any danger, it is theirs to encounter and overcome it.    The rights of the Society are clear, vested, and prior rights ; and the enjoyment of them in their full extent will be secured.

The injunction is refused.

Oct. 1830.

Soc. for establishing Manufactures
v.
Morris Canal Company.